## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sheri Diane Fishbaugher,                          Civ. No. 11-1252 (MJD/JJK)

        Plaintiff,

v.

                               **REPORT AND RECOMMENDATION**

Michael J. Astrue,

        Defendant.

---

Fay E. Fishman, Esq., Peterson & Fishman, counsel for Plaintiff.

Gregory G. Brooker, Esq., and Lonnie F. Bryan, Esq., Assistant United States Attorneys, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Sheri Fishbaugher seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  Plaintiff filed a Motion for Summary Judgment and the Commissioner filed a Motion to Remand.  (Doc. Nos. 8, 14.).  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636, Fed. R. of Civ. P. 72, and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends granting Plaintiff's Motion for Summary Judgment and denying Defendant's Motion to Remand.

1

## BACKGROUND

### I.   Procedural History

Plaintiff protectively filed an application for disability insurance benefits

("DIB") on March 20, 2007, alleging a disability onset date of December 30, 2003.

(Tr. 10, 129–33.)[1]  Her date last insured is December 31, 2006.[2]  (*See, e.g.*,

Tr. 10, 134.)  The application was denied initially and on reconsideration.

(Tr. 55–59, 63–65.)  Plaintiff timely requested a hearing, which was held before

an Administrative Law Judge ("ALJ") on February 10, 2010.  (Tr. 23–45, 66–67.)

On April 8, 2010, the ALJ issued an unfavorable decision.  (Tr. 7–22.)  Plaintiff

sought review of the ALJ's decision, but the Appeals Council denied the request

for review on April 12, 2011.  (Tr. 1–4.)  The denial of review made the ALJ's

decision the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v.*

*Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817,

822 (8th Cir. 1992).

On May 13, 2011, Plaintiff filed the instant action with this Court seeking

judicial review pursuant to 42 U.S.C. § 405(g).  (Doc. No. 1.)  Thereafter, Plaintiff

filed a motion for summary judgment.  *See* D. Minn. Loc. R. 7.2.  In response, the

---

[1]    Throughout this Report and Recommendation, reference to the
Administrative Record (Doc. No. 7), for this case is made by using the
abbreviation "Tr."

[2]    A claimant has to establish "the existence of a disability on or before the
date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166,
1168 (8th Cir. 1984).

Commissioner filed a motion to remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  Plaintiff opposes remand for further proceedings and seeks reversal for an award of benefits.

## II.     Statement of Facts

The following detailed medical history concerning Plaintiff's fibromyalgia and other relevant medical problems is drawn from the medical records that are part of the record in this case.

Dr. Dennis Colby evaluated Plaintiff for kidney infection at Cresco Medical Clinic on January 19, 2004.  (Tr. 498.)  An x-ray of her lumbar spine showed early degenerative changes.  (Tr. 498, 547.)  The next week, Plaintiff was evaluated for bladder infection, headache, and back pain.  (Tr. 497.)  Plaintiff's bladder infection was treated, and Dr. Colby recommended Aleve for headaches. (*Id.*)

On February 4, 2004, Plaintiff returned to Dr. Colby for treatment of mild back pain.  (Tr. 496.)  She also had some abdominal pain and blood in the urine. (*Id.*)  She was referred to Dr. Ajay Nehra at the Mayo Clinic Urology Department for evaluation of her recent episodes of hematuria and bilateral flank pain. (Tr. 449.)  Plaintiff had a long history of bilateral vesicoureteral reflux,[3] and later,

---

[3]     Vesicoureteral reflux is the passage of urine from the bladder back into a ureter. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1640 (31st ed. 2007).

significant flank pain with off and on episodes of pyelonephritis.[4]  (*Id.*)  Dr. Nehra

ordered a CT urogram, cystoscopy, and lab tests.  (*Id.*)

Dr. Nehra referred Plaintiff to Dr. Shabana Pasha for a multi-system

evaluation, which was performed on February 12, 2004.  (Tr. 446–48.)  At that

time, Plaintiff reported that she had had low back pain for six months, and

intense pain that increased when Plaintiff was fatigued.  (Tr. 446.)  Tylenol only

mildly reduced her pain.  (*Id.*)  Also, based on an outside x-ray report, Plaintiff

stated she was concerned about spinal infection.  (*Id.*)  She reported an onset of

constipation for one month, which did not improve with Miralax, and she was

taking Percocet recently, which might have been contributing to her constipation.

(*Id.*)  Plaintiff also reported constant lower abdominal discomfort.  (*Id.*)  Plaintiff's

physical examination was normal, with the exceptions of mild tenderness of the

abdomen and tenderness over the lumbosacral paraspinal region.  (Tr. 447.)

She was referred to Physical Medicine & Rehabilitation for her back pain.  (*Id.*)

Plaintiff had an MRI of her lumbar spine that same day.  (Tr. 428.)  The

MRI showed degenerative disk disease with loss of space height and bulging of

the annulus fibrosus at the L2 interspace, and mild associated degenerative

changes at the adjacent L2 and L3 endplates.  (*Id.*)  There were also changes of

---

[4]      Pyelonephritis is inflammation of the kidney and renal pelvis because of
bacterial infection.  *Dorland's* at 1582.

spondylosis[5] at the L3 and L4 interspaces, with bulging of the annulus fibrosus and facet joint hypertrophy.  (*Id.*)  The MRI also showed small presumed cysts on the kidneys.  (*Id.*)  Testing confirmed the simple cysts on the kidneys, a tiny indeterminate nodule on the right lung base, and two tiny cysts on the liver.  (*Id.*)

Also on February 12, 2004, Plaintiff saw Dr. Andrea Boon in the Physical Medicine and Rehabilitation Department at Mayo Clinic.  (Tr. 455–57.)  Dr. Boon reviewed Plaintiff's daily activities and her symptoms.  (Tr. 455.)  Plaintiff lived on a farm with her husband, where they managed a large hog and cattle herd.  (*Id.*)  Their four-year-old and fourteen-year-old children lived with them.  (*Id.*)  Plaintiff also had an 18-year-old son who lived in Los Angeles.  (*Id.*)

Plaintiff reported that she was in a car accident at approximately age eighteen, with back pain lasting a year.  (*Id.*)  Her back pain significantly increased after her second pregnancy.  (*Id.*)  Her back pain was manageable, until the last six months.  (*Id.*)  The pain started in the low back and spread to the lower thoracic spine.  (*Id.*)  Plaintiff also reported a fifty pound weight loss associated with her medication for attention deficit disorder.  (*Id.*)

Plaintiff's back pain was constant and worse when riding in a car or sitting more than a few minutes, but she had a little relief from lying down.  (*Id.*)  The pain got worse as the day continued, but she had some relief from changing positions.  (*Id.*)  Plaintiff agreed that she had a low pain tolerance, but she used

---

5      Spondylosis is used to generally describe degenerative spinal changes due to osteoarthritis. *Dorland's* at 1780.

to cope better.  (*Id.*)  Ibuprofen did not help at all, and Plaintiff was using an old

prescription she had for Percocet from a past surgery.  (*Id.*)  Plaintiff also

reported that she developed constipation and difficulty sleeping in the last couple

months.  (Tr. 456.)  She woke up wet from sweating.  (*Id.*)  She also had long-

standing urinary tract problems.  (*Id.*)

On examination, Plaintiff was overweight and clearly distraught.  (*Id.*)  She

walked tentatively but normally.  (*Id.*)  The strength, bulk, and tone of all major

muscle groups were normal.  (*Id.*)  Reflexes and sensation were normal.  (*Id.*)

Straight leg raise test was normal.  (*Id.*)  Tenderness to palpation was consistent

with fibromyalgia.[6]  (*Id.*)  And lumbar range of motion was decreased secondary

to pain.  (*Id.*)  Dr. Boon noted that Plaintiff was extremely agitated about her

current level of symptoms and recommended pain control to prevent Plaintiff

from developing full-blown chronic pain syndrome.  (Tr. 457.)  She also

recommended an MRI, epidural steroid injection, Vioxx, Trazodone for sleep, and

---

[6]      Fibromyalgia is a disorder of unknown cause characterized by
chronic widespread aching and stiffness involving particularly the
neck, shoulders, back and hips, which is aggravated by use of the
affected muscles.  The American College of Rheumatology has
established diagnostic criteria that includes pain on both sides of the
body, both above and below the waist, as well as in an axial
distribution (cervical, thoracic, lumbar spine or anterior chest).
Additionally, point tenderness must be found in at least 11 of 18
specified sites. . . . Usually associated fatigue, a sense of weakness
or inability to perform certain movements, paresthesia, difficulty
sleeping and headaches are found.

*Stedman's Medical Dictionary* 725 (28th ed. 2006).

physical therapy.  (*Id.*)  In addition, she recommended a formal psychiatric
evaluation.  (*Id.*)

Plaintiff followed up with Dr. Pasha on February 17, 2004, to review test
results.  (Tr. 444–45.)  At that time, Plaintiff's degenerative lumbar spondylosis
was treated with corticosteroid injection.  (Tr. 444.)  Dr. Pasha noted that Plaintiff
initially presented with weight loss, but now had an eight pound weight gain.  (*Id.*)
Her thyroid function was normal and she had no other symptoms to suggest an
endocrinological disorder.  (*Id.*)  And her remaining lab results were normal.  (*Id.*)

Plaintiff also saw Brian Bjerke for physical therapy that day and was
instructed in the dynamic lumbar program – specifically for use of "lumbar
neutral" in activities of daily living.  (Tr. 454.)  Plaintiff performed a number of
stretches and was instructed to continue at home.  (*Id.*)

On February 23, 2004, Dr. Nehra diagnosed Plaintiff with bilateral flank
pain, with no evidence of hematuria and normal CT urogram findings.  (Tr. 443.)
He recommended follow up with Dr. Boon and Dr. Shabana.  (*Id.*)  In physical
therapy with Brian Bjerke that day, Plaintiff's discomfort had not decreased.
(Tr. 453.)  Plaintiff reviewed her lumbar exercises, but she was in too much pain
to progress further.  (*Id.*)  Three days later, Plaintiff called Dr. Pasha to report that
her back pain was worse, she was unable to sleep, and she had difficulty
performing activities.  (Tr. 442.)  Plaintiff questioned whether she might have
fibromyalgia.  (*Id.*)  Because Plaintiff's clinical presentation and MRI findings did
not suggest another cause of her back pain, Dr. Pasha recommended evaluation

in the Pain Rehabilitation Department for chronic pain syndrome/fibromyalgia. (*Id.*)

On March 2, 2004, Plaintiff went over her Mayo Clinic evaluations with Dr. Colby. (Tr. 494.) Dr. Colby noted that Plaintiff had educated herself about fibromyalgia, and she continued to have back pain at a level of eight or nine out of ten. (*Id.*) Dr. Colby prescribed Klonopin and Ultram. (*Id.*) Dr. Colby also completed a form indicating that Plaintiff could not bend, lift, or clean, and she needed daycare for her child. (Tr. 657.)

The next week, Plaintiff told Dr. Colby she was doing "fair." (Tr. 493.) Her pain was somewhat better with treatment, but then started to recur. (*Id.*) Plaintiff reported that she wanted to get off Percocet. (*Id.*) Dr. Colby prescribed Ultram, and Plaintiff's other medications at that time were Vioxx, Klonopin, Lexapro, Adderall, and Trazodone. (*Id.*) Ten days later, Plaintiff reported doing fairly well with treatment. (Tr. 492.) She stated that she recently went on a trip without many problems. (*Id.*) At that time, Dr. Colby provided OMT[7] and hot packs. (*Id.*)

On March 24, 2004, Dr. Margaret Moutvic and Nurse Elizabeth Miller evaluated Plaintiff for fibromyalgia at the Mayo Clinic Fibromyalgia Treatment Program. (Tr. 435–37, 439–41.) Plaintiff reported that her medical history included many years of urologic dysfunction, with repeated infections coming

---

[7]    OMT stands for Osteopathic Manipulative Treatment, manipulation performed by a doctor of osteopathy to improve joint range of motion and balance tissue and muscle mechanics to relieve pain. http://www.spine-health.com/treatment/spine-specialists/osteopathic-manipulative-treatment-omt.

back in the last couple years and blood in her urine earlier in the year in January. (Tr. 435, 439.)  She had low back pain that was diagnosed as osteoarthritis and myofascial element.  (Tr. 435.)  During this visit, Plaintiff questioned whether she had fibromyalgia.  (*Id.*)  Her symptoms included fatigue, poor sleep, headaches, TMJ pain, lightheadedness, imbalance, palpitations, night sweats, irritable bowel, irritable bladder, numbness, tingling, stiffness, muscle spasms, cold intolerance, heat intolerance, multiple sensitivities, short-term memory impairment, decreased concentration, anxiety, crying spells, and irritability.  (Tr. 439.)  Her symptoms were aggravated by exertion, repetitive motion, prolonged sitting or standing, and stress.  (*Id.*)  Plaintiff was also receiving the services of a home health aide through her county for twenty-eight hours a week.  (*Id.*)

Plaintiff reported that she was taking Adderall for adult attention deficit disorder.  (Tr. 435.)  She reported that she always excelled in school and was now worried about having poor memory.  (*Id.*)  On mental status examination, Plaintiff did not seem anxious, but her speech was somewhat pressured. (Tr. 436.)  Her memory was normal.  (Tr. 440.)  On neurological examination, balance was difficult for her.  (Tr. 436.)  It was hard to assess her strength due to give-way weakness.  (*Id.*)  Reflexes and sensation were normal.  (*Id.*)  Joint range of motion was full, but Plaintiff was tender almost everywhere.  (*Id.*)  She had eighteen of eighteen standard tender points.  (Tr. 440.)  The straight leg raise test was very painful, but not in a radicular pattern.  (Tr. 436.)  And lab tests showed slight anemia, but were otherwise normal.  (Tr. 437.)

Dr. Moutvic diagnosed Plaintiff with fibromyalgia and recommended a one-and-a-half day Fibromyalgia Treatment Program, and if that was insufficient to improve Plaintiff's functioning, the Pain Rehabilitation Program.  (Tr. 437, 441.) The Fibromyalgia Treatment Program focused on addressing the nervous system's hyper-responsiveness to normal stimuli, and improving sleep, fitness, and exercise.  (Tr. 437, 441.)  Dr. Moutvic did not recommend any changes to Plaintiff's medications because she was already taking Trazodone and Lexapro. (Tr. 437.)

On March 25, 2004, Plaintiff consulted with Dr. Christopher Sletten at the Mayo Clinic Pain Rehabilitation Center.  (Tr. 432–33.)  Plaintiff had just completed the Fibromyalgia Treatment Program, but she felt she needed more intensive treatment because her ability to assist her husband on their farm and to take care of the household was greatly diminished by pain.  (Tr. 432.)  Dr. Sletten recommended a three-day treatment program with physical and occupational therapy for physical reconditioning and improving activity tolerance.  (*Id.*)

On April 2, 2004, Plaintiff saw Dr. Colby again, and rated her pain at an eight out of ten.  (Tr. 491.)  Plaintiff reported that she did not think she could do the Mayo rehabilitation program because there was farm work coming up that would need to be done.  (*Id.*)  Dr. Colby treated Plaintiff with OMT and hot packs. (*Id.*)  When Plaintiff followed up with Dr. Colby on May 12, 2004, she was under increased stress because her step-daughter moved in with them when her mother died.  (Tr. 490.)  Dr. Colby noted that he felt this stress increased

10

Plaintiff's fibromyalgia.  (*Id.*)  He took Plaintiff off Lorazepam, but increased her

Trazodone.  (*Id.*)  A couple of weeks later, Plaintiff reported that, as a result of

the fibromyalgia she was not doing well, although Trazodone had improved her

sleep.  (Tr. 489.)  On examination, Plaintiff had point tenderness and marked

spasms in the cervical, thoracic, and lumbar spine.  (*Id.*)  Dr. Colby provided

OMT and hot packs again.  (*Id.*)  And Plaintiff was treated with Diflucan for oral

candidiasis.[8]  (*Id.*)

On May 24, 2004, Plaintiff complained to Dr. Colby of pain everywhere,

and rated it at a level nine out of ten.  (Tr. 488.)  She felt this was caused by

overdoing it the previous day helping with the farm chores.  (*Id.*)  Dr. Colby noted

that Plaintiff seemed to do better when she did not overdo it.  (*Id.*)  The next

week, Dr. Colby treated Plaintiff for a bladder infection.  (Tr. 487.)  And the next

month, Plaintiff reported feeling significantly worse after taking a long-distance

trip to California.  (Tr. 486.)  She tolerated the trip but her stress increased her

pain.  (*Id.*)  Dr. Colby treated her with OMT and hot packs.  (*Id.*)  A week later,

Plaintiff reported some improvement with physical therapy.  (Tr. 485.)  However,

the following week, Plaintiff's back pain was worse.  (Tr. 484.)  Plaintiff followed

up again on August 18, 2004, reporting low blood sugars.  (Tr. 482.)  Dr. Colby

diagnosed fibromyalgia, fatigue, and hyperglycemia.  (*Id.*)  He treated Plaintiff

---

[8]     Oral candidiasis is also called thrush, which is characterized by white
plaques that may be stripped off, leaving a raw bleeding surface in the mouth.  It
usually affects sick or weak infants, individuals in poor health, and
immunocompromised patients.  *Dorland's* at 285.

with OMT and hot packs and ordered lab tests.  (*Id.*)  Two days later, he treated Plaintiff for headache and sinus infection.  (Tr. 481.)

When Plaintiff saw Dr. Colby on September 2, 2004, she was having fibromyalgia pain and discomfort throughout her body.  (Tr. 480.)  Physical therapy was helping, but she had trouble sleeping at night.  (*Id.*)  Dr. Colby treated Plaintiff with OMT treatment and hot packs.  (*Id.*)  By the end of the month, Plaintiff had gained eight pounds.  (Tr. 479.)  Dr. Colby noted that Plaintiff was hypoglycemic and set up a dietary consult.  (*Id.*)  Plaintiff also complained of hot and cold flashes, and Dr. Colby ordered testing for perimenopausal syndrome.  (*Id.*)  Two weeks later, Plaintiff's low back was quite sore, and Dr. Colby treated her again with hot packs, and also prescribed a Tens Unit. (Tr. 478.)

On November 3, 2004, Plaintiff reported doing "fair," but Dr. Colby thought she had been trying to do too much.  (Tr. 477.)  The next week, Plaintiff reported that she was in quite a bit of back pain, and she stated that she "overdid it" that last weekend and had to lie on the couch the next day.  (Tr. 476.)  The next month, Plaintiff reported back pain and crying episodes, which she attributed to the season.  (Tr. 474.)  Plaintiff also had marked spasms in her back.  (*Id.*) Dr. Colby added Celebrex to Plaintiff's medications.  (*Id.*)  Several weeks later, Plaintiff's back pain and sadness continued, and Dr. Colby treated her with OMT and hot packs.  (Tr. 475.)

On January 3, 2005, Plaintiff complained to Dr. Colby of back pain and
headaches.  (Tr. 473.)  Dr. Colby noted that Plaintiff had some improvement in
her fibromyalgia from Skelaxin at that time, which he had prescribed in addition
to Adderall, Percocet, Keflex, and Tazorac.  (*Id.*)  However, several days later
Plaintiff saw Dr. Colby again after falling on some ice.  (Tr. 472.)  She reported
hurting all over, with pain radiating down her legs.  (*Id.*)  Upon examination, she
had marked spasms in the cervical, thoracic, and lumbar muscles, but no
fractures were seen on x-rays.  (Tr. 472, 544.)  Dr. Colby diagnosed Plaintiff with
thoracic lumbar sprain and prescribed a Medrol dose pack.  (Tr. 472.)  Six days
later, Plaintiff was better but still rated her pain at an eight out of ten.  (Tr. 471.)
And when she saw Dr. Colby in February 2005, she reported pain in her low
back, mid back, and neck.  (Tr. 470.)  She also had increased bowel problems.
(*Id.*)  Dr. Colby continued to treat Plaintiff with OMT and hot packs.  (Tr. 469,
470.)

On April 4, 2005, Dr. Colby wrote a letter to Disability Determination
Services[9] about Plaintiff's inability to work.  (Tr. 467.)  Dr. Colby noted that
Plaintiff was diagnosed with fibromyalgia at Mayo Clinic, and that she was unable
to work due to severe back pain.  (*Id.*)  He noted that Plaintiff could not do her

[9]     In Minnesota, the Disability Determination Services of the Minnesota
Department of Jobs and Training has been designated to handle the first two
stages of the Social Security disability administrative adjudication process, under
the authority and control of the Commissioner of Social Security.  *Schoolcraft v.
Sullivan*, 971 F.2d 81, 83 (8th Cir. 1992).

normal activities of daily living, or stand, sit, walk, carry, or lift for any length of

time.  (*Id.*)  He stated that if Plaintiff tried to be more active, she would need to

rest in bed for the next day or two.  (*Id.*)  He indicated that her medication helped

keep her focused, but without medication, her attention was very poor.  (*Id.*)

    Plaintiff also underwent a consultative psychological evaluation with

Dr. Debra Moran on April 25, 2005, at the request of the Social Security

Administration.  (Tr. 551.)  Dr. Moran noted that Plaintiff first married at age

eighteen, and her first husband was abusive.  (*Id.*)  She had two children and she

was divorced in 1993.  (Tr. 551–52.)  She remarried in 2003, and raised her two

children, her step-child, and an adopted five-year-old son with her second

husband.  (Tr. 552.)

    Plaintiff explained to Dr. Moran that she had a high school education, and

took some civil engineering classes, but quit to help her husband on their farm.

(*Id.*)  She reported being in too much pain to help now, and her husband had to

hire help off and on.  (*Id.*)  From 1994 to 1998, Plaintiff and her husband had

owned a movie theater.  (*Id.*)  And before that, Plaintiff operated an in-home

daycare center for five years.  (*Id.*)

    Plaintiff reported that she was diagnosed with fibromyalgia in March 2004,

but that she had some symptoms of hypersensitivity to her skin all her life.  (*Id.*)

She was also depressed and experienced pain in her body for much of her life.

(*Id.*)  Plaintiff rated her pain that day as "much higher than a 10" but her pain

level averaged seven or eight on a scale of one to ten.  (*Id.*)  She could not walk

14

long distances; her neck pain and headaches were constant; she had episodes of "fibro fog" where she could not think straight; her sleep was disturbed; and she had chronic kidney infections.  (*Id.*)  Plaintiff also had a long history of depression.  (Tr. 553.)  When depressed, her symptoms were fatigue, hopelessness, worthlessness, and crying spells.  (*Id.*)  She also had difficulty with organization, attention, and concentration.  (*Id.*)

Plaintiff reported that she would typically wake up at 8:15 a.m. to get her son ready for school.  (*Id.*)  Then, she would watch television or do some scrapbooking, and would try to clean.  (*Id.*)  Plaintiff reported that she did not shower or change her clothes every day.  (*Id.*)  She or her husband would make lunch, and washing dishes was sometimes too painful for her.  (*Id.*)  After gardening for two hours one day, she could not move the next day.  (*Id.*)  She could not do laundry or yardwork.  (*Id.*)  On a good day, she would buy groceries.  (*Id.*)  She tried to pick up after her son, she helped with supper twice a week, she enjoyed reading, and she was able to do bookwork.  (*Id.*)  She went to bed between 10:00 p.m. and 3:00 a.m.  (*Id.*)

On examination, Dr. Moran found that Plaintiff's mental status was normal, her memory appeared adequate, and her mood was euthymic.  (Tr. 553–54.)  Dr. Moran diagnosed Plaintiff with major depressive disorder, ADD, and fibromyalgia.  (Tr. 554.)  She opined that Plaintiff's pace may be slow, but her persistence was probably adequate.  (*Id.*)  She also thought Plaintiff's concentration would likely be limited, but that Plaintiff could interact appropriately

with others in the workplace.  (*Id.*)  In addition, Dr. Moran opined that Plaintiff

would be capable of understanding simple instructions, but may have difficulty

with complex instructions when she was in more physical pain.  (*Id.*)

On May 12, 2005, Dr. Alan Suddard reviewed Plaintiff's medical records

and completed a Physical Residual Functional Capacity Assessment form

regarding Plaintiff at the request of the Social Security Administration.  (Tr. 557–

64.)  Dr. Suddard opined that Plaintiff had the ability to frequently lift ten pounds,

but no more than that, and Plaintiff could stand and/or walk two hours in an eight-

hour workday, and sit for six hours in an eight-hour workday.  (Tr. 558.)  He

found no other limitations and wrote the following:  "Lack of objective findings to

support multiple pain complaints.  Aerobic exercise has been prescribed for this

condition.  This is not to suggest that as an RFC here, but there doesn't seem to

be any barrier to seated work."  (*Id.*)

On the same day, a state agency psychological consultant reviewed

Plaintiff's record at the request of the Social Security Administration, and

completed a Psychiatric Review Technique form regarding Plaintiff.  (Tr. 566–

79.)  The consultant opined that Plaintiff's mental impairments of ADHD and

major depressive disorder resulted in mild restrictions in Plaintiff's activities of

daily living; mild difficulties in Plaintiff's social functioning; and moderate

difficulties in maintaining concentration, persistence, or pace.  (Tr. 566–76.)

On May 28, 2005, Plaintiff went to the Regional Health Services of Howard

County emergency room for treatment of a severe headache.  (Tr. 603–10.)

Plaintiff vomited and complained of light intolerance.  (Tr. 605.)  A CT scan of Plaintiff's head was negative and her physical examination was normal.  (Tr. 605, 607.)  Plaintiff was released after some improvement with Phenergan, Demerol, and Toradol.  (Tr. 606.)

On February 12, 2007, Plaintiff was evaluated for left knee pain by Dr. Randall Gall.  (Tr. 618–19.)  Plaintiff reported that her left knee pain had lasted six months and hurt when using stairs and getting up from the floor. (Tr. 618.)  Plaintiff had some pain on examination, and moderate effusion of the left knee.  (*Id.*)  Her MRI showed a popliteal cyst, laterally subluxed patella, and chondromalacia of the medial joint compartment, but no other abnormalities. (*Id.*)  Dr. Gall recommended a quad strengthening program for treatment.  (*Id.*)

On July 23, 2007, based on evidence of Plaintiff's migraine headaches and knee pain, Dr. Howard Atkin provided the Social Security Administration with a Physical Residual Functional Capacity Assessment regarding Plaintiff.  (Tr. 630– 37.)  He limited Plaintiff to medium exertional work, with occasional climbing ramps, stairs, ladders, ropes, and scaffolds; occasional kneeling; and occasional crawling.  (Tr. 630–32.)  Dr. Atkin's opinion was affirmed by Dr. Sandra Eames on December 11, 2007.  (Tr. 649–51.)

On August 27, 2007, Plaintiff underwent a psychological consultative evaluation with Dr. Daniel Carlson, at the request of the Social Security Administration.  (Tr. 640–42.)  Plaintiff reported that her physical conditions of fibromyalgia, degenerative disk disease, thyroid disease, and pre-diabetes,

17

contributed to her depression.  (Tr. 640.)  She also reported that she was

diagnosed with ADD six or seven years earlier, and had difficulty with attention,

misplacing things, not finishing tasks, and being forgetful.  (*Id.*)  She could not

identify any problems that were caused by her attention deficit symptoms in work

situations, but she stated that Adderall helped her ADD greatly.  (*Id.*)

Plaintiff explained that she lived on a farm with her husband and children.

(Tr. 641.)  She had a personal care attendant who helped her up to thirty-five

hours a week.  (*Id.*)  Plaintiff watched television, and with help, cleaned and

gardened.  (*Id.*)  When she felt able, she knitted, made scrap books, did puzzles,

quilted, and sewed.  (*Id.*)  She also enjoyed playing legos with, and reading to,

her son.  (*Id.*)  She did not shop because it caused fatigue.  (*Id.*)  She iterated

that her concentration and persistence with tasks greatly improved with Adderall.

(*Id.*)  She stated that she generally got along with others, but that there were

some problems with family members accepting her diagnosis and physical

limitations.  (*Id.*)

On examination, Plaintiff's mental status was normal and her mood was

good.  (*Id.*)  Dr. Carlson noted that Plaintiff did not seem to have been limited by

ADD in her education or work history.  (Tr. 642.)  He assessed Plaintiff with a

GAF score of 75.[10]  (*Id.*)  Based on her mental, not physical, impairments,

---

[10]     The Global Assessment of Functioning Scale ("GAF") is used to report "the
clinician's judgment of the individual's overall level of functioning."  *Hudson ex rel
Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting *Diagnostic and*
(Footnote Continued on Next Page)

Dr. Carlson opined that Plaintiff could perform work tasks with adequate

persistence and pace; could respond appropriately to brief contact with co-

workers and supervisors; and had a good ability to respond to the stress of an

entry-level job.  (*Id.*)  On September 4, 2007, state agency consultant

Dr. Thomas Kuhlman completed a Psychiatric Review Technique Form regarding

Plaintiff at the request of the Social Security Administration.  (Tr. 585–98.)  He

also opined that Plaintiff did not have a severe mental impairment.  (Tr. 585.)

Dr. Kuhlman's opinion was affirmed by Dr. Russell Ludeke on December 11,

2007.  (Tr. 652–54.)

On February 14, 2008, Dr. Colby signed a form apparently indicating his

opinion that Plaintiff needed personal care assistant ("PCA") services.  (Tr. 655,

239–416 (PCA records)).  Then, on October 17, 2008, Dr. Colby signed a

Fibromyalgia Residual Functional Capacity Questionnaire, apparently completed

by someone else, stating that he agreed with what was in the form.  (Tr. 658–63.)

The top of the form instructed:  "Please complete this form for her condition prior

(Footnote Continued from Previous Page)
*Statistical Manual of Mental Disorders* 32 ("DSM-IV-tr") (4th ed. text revision
2000)).  GAF scores of 61-70 indicate the individual has some "mild symptoms
(e.g., depressed mood and mild insomnia) or some difficulty in social,
occupational or school functioning (e.g., occasional truancy or theft from within
the household), but generally [is] functioning pretty well [and] has some
meaningful interpersonal relationships."  *DSM-IV-tr* at 34.  A GAF score of 71 to
80 indicates that "[i]f symptoms are present, they are transient and expectable
reactions to psychological stressors (e.g., difficulty concentrating after family
argument); [the individual has] no more than slight impairment in social,
occupational, or school functioning (e.g., temporary falling behind in
schoolwork)."  *Id.* at 32.

to December 2006." (Tr. 658.)  The responses to questions on the form indicated that stress contributed to the severity of Plaintiff's symptoms, but she was not a malingerer.  (Tr. 659.)  Also, Plaintiff had pain all over, every day, and it was worse with overuse.  (Tr. 659–60.)  Changing weather, stress, fatigue, cold, overuse, and hormonal changes all precipitated pain.  (Tr. 660.)  The form indicated that Plaintiff's pain was severe enough to interfere with attention and concentration constantly, but she could tolerate low stress.  (*Id.*)

The form also indicated that Plaintiff could walk 200 feet without rest or severe pain.  (Tr. 661.)  She could sit or stand for thirty minutes at a time, but only for a total of less than two hours a day in each position.  (*Id.*)  She would need to walk for ten or fifteen minutes every thirty minutes.  (*Id.*)  She would need to be able to shift positions at will, and would need unscheduled breaks during an eight-hour working day.  (Tr. 662.)  She could lift and carry five pounds in a competitive work setting.  (*Id.*)  But repetitive motions increased her pain, and she was limited in her grasping, fine finger manipulations, and reaching with her arms, and she could not stoop or crouch.  (Tr. 662–63.)  The form indicated that Plaintiff had good days and bad days, but the majority were bad days.  (*Id.*)  And she would likely miss work due to her impairments more than four times a month. (*Id.*)

### III.    Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified to the following at the hearing before the ALJ on February 10, 2010.  (Tr. 25–41.)  Plaintiff was a high school graduate and studied civil engineering for one year in college.  (Tr. 27.)  At the time of the hearing, she lived with her husband, who was a farmer, and their two children aged eighteen and ten.  (Tr. 26.)

Plaintiff described how she spent her days.  She woke up but did not get out of bed when her son went to school at 7:00 a.m.  (*Id.*)  She watched television and stayed in bed until 11:00 a.m.  (*Id.*)  Then, she went downstairs to knit or scrapbook.  (*Id.*)  She went back to bed to watch television or read at 4:00 or 5:00 p.m.  (Tr. 27–28.)  She had a personal care attendant, thirty-five hours per week, to do housework and remind her to take medications.  (Tr. 28.) Plaintiff watched movies, played games, and went to church activities with her family.  (*Id.*)  She taught at her church, but only twenty minutes every six months. (*Id.*)  She did not do things with friends.  (Tr. 28–29.)  She was a member of an on-line fibromyalgia support group, and she also used a computer to look things up for her husband and son.  (Tr. 29.)  She no longer did bookwork because it was too stressful for her.  (*Id.*)

Plaintiff last worked by helping her husband farm.  (Tr. 29–30.)  This consisted of caring for pigs and cattle, and driving a tractor.  (Tr. 30.)  She quit this work when she got sick.  (*Id.*)  Plaintiff did some stretching twice a week, and

on days she had bad pain, she took Percocet in addition to other medications. (Tr. 30–31.)  Her medications caused dry mouth, and Percocet made her sleepy. (Tr. 31.)  Plaintiff testified that she did not think she could work because she has to go to the bathroom frequently, is unable to sit in one spot for long without adjusting, and loses her focus and concentration.  (Tr. 32.)  She also had knee pain related to a weight problem, but she testified that her knee has felt pretty good for some time.  (*Id.*)  Plaintiff stated that she has a bad migraine headache once or twice a month.  (Tr. 32–33.)  However, her pain was over her whole body, and she felt like she had the flu all the time.  (Tr. 33.)  Plaintiff stated that she had good days and bad days.  (Tr. 35.)  On a good day, she would be active for two or three hours, but only fifteen minutes at a time before a break.  (*Id.*)  On bad days, occurring two or three times a week, she did not get out of bed, and she wore pajamas most days.  (Tr. 35–36.)

At the hearing, Plaintiff addressed a medical record that indicated that she was hurt while riding a four-wheeler.  (*Id.*)  She stated that she only rode the four-wheeler twice a year, to give her son a ride.  (Tr. 36–37.)  She also addressed a medical record that indicated that she walked at the Mall of America for eleven hours one day.  (Tr. 37.)  Plaintiff stated that it was for a school program for her son, so she pushed herself to go.  (*Id.*)  She sat quite a bit that day, and could not do anything for the next two or three days.  (*Id.*)  Finally, Plaintiff addressed a reference in the record to her hauling hay.  (Tr. 37–38.)  She stated that what that referred to was when she drove a truck into a field and sat there while her

husband loaded the truck.  (*Id.*)  She had not done this very often, and she was no longer doing any farm activities.  (Tr. 38.)

Plaintiff testified that she was not sure if she could stand for thirty minutes at a time, as her doctor indicated.  (*Id.*)  At times, she could not sit through a meal and had to stand.  (*Id.*)  And after sitting for thirty minutes, she would lay down.  (Tr. 38–39.)  She could walk 200 feet and lift five pounds.  (Tr. 39.) Plaintiff stated that she was depressed due to her pain.  (Tr. 40.)  But she took Cymbalta for depression and fibromyalgia, and thought it helped.  (*Id.*)

### Medical Expert Testimony

A medical expert, Dr. Jared Frazin (not identified by name in the hearing transcript but identified by resume in the record), testified at the hearing.  (Tr. 41– 43, 127.)  He opined that Plaintiff did not meet or equal a listed impairment. (Tr. 41–42.)  And he agreed with Dr. Colby's RFC opinion, finding it to be supported by the rest of the medical record.  (Tr. 42.)

### Vocational Expert Testimony

Kenneth Ogren testified at the hearing as a vocational expert.[11]  (Tr. 43– 44.)  The ALJ asked Ogren the following hypothetical:

> [A]ssume then that we have an individual who at alleged onset was
> 36, who is currently . . . 42 years of age, who has high school[] plus
> education, work experience as outlined by yourself, who is on a
> number of medications, the only apparent side effects being some

---

[11]    Based on the Vocational Case Consultant analysis, it appears that the vocational expert was Kenneth Ogren, whom the transcriber of the administrative hearing misidentified as "Mr. O'Burne."  (Tr. 420.)

dry mouth and sleepiness, who is impaired with chondro patella bilaterally, fibromyalgia, suffers migraines, obesity, depression, anxiety, has a history of ADHD and history of urinary infection and IBS.  Said individual is limited to lifting and carrying 10 pounds occasionally, five pounds frequently and can do all functional aspects of sedentary work.  However, the individual would be limited to work where there would be easy access to bathroom facilities and then I mean on the same floor, which would allow a change of position every 30 minutes at the work station, who could do work which would require only occasional overhead work, bending, stooping, crouching, crawling, twisting or climbing, who must avoid moderate vibrations, temperature, humidity changes and hazardous equipment and who would be limited to work having only brief and superficial contact with others.  Could such a person do any work the [Plaintiff] has previously done?

(Tr. 43.)  The vocational expert responded that such a person could not perform Plaintiff's past relevant work, but could perform other work such as information aide, inspector, and polisher.  (Tr. 43–44.)  He explained that there were 21,000 information aide jobs, 1,200 inspector jobs, and 3,000 polisher jobs all in the state of Minnesota.  (Tr. 44.)

In a second hypothetical, the ALJ asked whether there would be any work in the regional or national economy for the same individual described in the first hypothetical if that person, "due to waxing and waning of symptoms, would be unable to attend to work with persistence and pace and be limited to part-time work and be absent from the work place more than two days a month."  (Tr. 44.) The vocational expert responded that there would be no jobs that such a person could perform.  (*Id.*)

IV.    The ALJ's Findings and Decision

On April 8, 2010, the ALJ issued a decision concluding that Plaintiff was not disabled as defined by the Social Security Act at any time from the alleged onset date of December 30, 2003, through December 31, 2006, the date last insured, and therefore denied Plaintiff's application for disability insurance benefits.  (Tr. 10–22.)  The ALJ followed the five-step procedure as set out in the Code of Federal Regulations.  *See* 20 C.F.R. § 404.1520(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity;" (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities;" (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform."  *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of December 30, 2003, through her date last insured of December 31, 2006.  (Tr. 12.)  At step two,

25

the ALJ found that Plaintiff had the following severe impairments through the date last insured: "degenerative lumbar spondylosis, fibromyalgia, obesity, a history of urinary tract infections, irritable bowel symptoms, depressive disorder, anxiety disorder, a history of attention deficit disorder, and a history of methamphetamine abuse." (*Id.*)  The ALJ found that Plaintiff's headaches were nonsevere because they occurred only once or twice a month. (*Id.*)  And the ALJ found that Plaintiff's left knee pain was nonsevere because she testified that recently her knee felt pretty good. (Tr. 12–13.)

At step three of the disability determination procedure, the ALJ found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13.)  Based on Plaintiff's mental impairments, the ALJ concluded that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 13–14.)  In addition, the ALJ found that Plaintiff had no episodes of decompensation of extended duration, and that there was no evidence to establish the "C criteria" of the listed mental impairments. (Tr. 14.)

The ALJ found that Plaintiff had the RFC to perform all functional aspects of sedentary work as defined in 20 C.F.R. § 404.1567(a), except with the following limitations:

26

> [L]ifting 10 pounds occasionally and 5 pounds frequently; limited to
> work offering easy toilet access, with bathroom facilities on the same
> floor as the workspace; with an allowance for change of position
> every 30 minutes at the workstation; involving only occasional
> overhead work; limited to only occasional bending, stooping,
> crouching, crawling, twisting, and/or climbing; precluding even
> moderate exposure to vibrations, hazardous equipment and
> changes in temperature and/or humidity; and limited to work
> involving no more than brief and superficial contact with others.

(*Id.*)  At step four, the ALJ concluded Plaintiff could not perform her past relevant

work as a farmer.  (Tr. 21.)  And at step five, the ALJ found that based on the

vocational expert's testimony there were other jobs that existed in significant

numbers in the national economy that Plaintiff could have performed.  (*Id.*)  Thus,

she ultimately concluded that Plaintiff was not "under a disability, as defined in

the Social Security Act, at any time from December 30, 2003, the alleged onset

date, through December 31, 2006, the date last insured[.]"  (Tr. 22.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.  "Disability" under the Social Security Act means the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of

not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "An individual shall be

determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *See Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

**II.     The Commissioner's Motion to Remand and Plaintiff's Motion for
         Summary Judgment**

This case presents the somewhat unusual circumstance where the

Commissioner does not seek to affirm the ALJ's decision.  Here, the

Commissioner agrees that the ALJ improperly rejected the opinions of a treating

medical source and a medical expert based on a flawed assumption that their

opinions did not pertain to the relevant time period.  The Commissioner seeks

remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g),

arguing that remand is appropriate because the record contains contradictory

medical and nonmedical evidence that should be weighed by the ALJ, and

because the record does not overwhelmingly support an outright award of

benefits.  The Commissioner contends that the ALJ should have the opportunity

to consider evidence in the record that Plaintiff engaged in activities that

contradicted her claims of disability.  The Commissioner also points out that

Dr. Colby, Plaintiff's treating physician, offered two RFC opinions, and the 2008

opinion contained greater limitations than the 2005 opinion.  Further, the

Commissioner contends that the ALJ should consider the state agency

physicians' opinions that Plaintiff had a greater RFC than Dr. Colby assigned to

her.

Plaintiff opposes remand and seeks reversal for an award of benefits.  She

contends that a remand would serve no purpose here because the treating

physician, affirmed by the medical expert, opined that Plaintiff would be restricted

to limited sedentary and only part-time work. And based on the treating physician's RFC opinion, the vocational expert testified that Plaintiff would be unable to perform her past relevant work or any other work. Plaintiff also contends that it is unnecessary to remand for the ALJ to consider the state agency physicians' opinions because the ALJ did not cite the state agency physicians' opinions as a basis for rejecting the treating physician's opinion. Further, if remand is ordered, Plaintiff argues that the record is complete and should not be expanded to give the ALJ an opportunity to bolster evidence to deny the claim.

### A.    Whether Remand is Necessary for the ALJ to Weigh the Medical Opinions

The typical remedy when the ALJ's disability determination is not supported by substantial evidence in the record as a whole is to remand for further administrative proceedings, especially in cases where the ALJ should have developed the record more fully. *See Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998). However, reversal and remand for an immediate award of benefits is the appropriate remedy where the record is fully developed and overwhelmingly supports a finding of disability. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009).

"The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir.

2003) (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)).  On the other

hand, a treating physician's opinion is entitled to controlling weight when "the

opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence

in the record."  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).  A consulting

physician's opinion may constitute substantial evidence on the record as a whole

if the consulting physician's opinion was supported by better or more thorough

medical evidence or if the treating physician rendered inconsistent opinions.

*Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007).

Here, the ALJ failed to recognize that Dr. Colby's opinion of Plaintiff's

physical limitations from fibromyalgia was supported by medically acceptable

clinical techniques.  Plaintiff's diagnosis of fibromyalgia was made based on

symptoms consistent with fibromyalgia and all eighteen tender points associated

with fibromyalgia.  *See supra* note 6; (Tr. 435–37, 439–41.)  Consistent trigger

point findings are objective evidence of fibromyalgia.  *Brosnahan v. Barnhart*, 336

F.3d 671, 678 (8th Cir. 2003).  Therefore, the diagnosis of fibromyalgia simply

does not require the type of objective findings the ALJ found absent in this case –

neuromuscular weakness, reduced range of motion of the joints, or inflammatory

muscle or joint disease.  (*See* Tr. 16); *see also Sarchet v. Chater*, 78 F.3d 305,

308 (7th Cir. 1996) ("Since swelling of the joints is not a symptom of fibromyalgia,

its absence is no more indicative that the patient's fibromyalgia is not disabling

than the absence of headache is an indication that a patient's prostate cancer is

not advanced."). Because Plaintiff's subjective complaints of pain were

consistent with her diagnosis of fibromyalgia, the ALJ should have given

Dr. Colby's opinion controlling weight if it was consistent with the other

substantial evidence in the record.

The Commissioner contends the case should be remanded for the ALJ to

consider whether Dr. Colby's 2005 and 2008[12] opinions are conflicting. Dr. Colby

wrote a letter to the Social Security Administration in 2005 stating that Plaintiff

could not do her normal activities of daily living, or stand, sit, walk, carry, or lift for

any length of time. (Tr. 467.) He also stated that if Plaintiff tried to be more

---

[12] The ALJ discounted Dr. Colby's 2008 RFC opinion because it "appears to relate to the [Plaintiff's] status in 2008, which was after her date of last insurance." (Tr. 20.) Similarly, the ALJ discounted the medical expert's testimony as to Plaintiff's limitations because the testimony was based on Dr. Colby's 2008 opinion. (Tr. 21.) However, this Court agrees with both parties that the ALJ's discounting of Dr. Colby's 2008 opinion was erroneous because the RFC instructions stated, "Please complete this form for [Plaintiff's] condition prior to December, 2006," and there is nothing in the record to suggest Dr. Colby did not follow this instruction. (Tr. 658); *see Scheets v. Astrue*, No. 09-3437-CV-S-REL-SSA, 2011 WL 144919, at *17 (W.D. Mo. Jan. 18, 2011) ("Medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured."); *Eastvold v. Astrue*, No. 03-3054, 2010 WL 1286334, at *47 (D. Minn. 2010) (finding that the ALJ properly rejected a medical report because it "was completed several years after the date last insured" and "does not purport to relate back to the date last insured").) Defendant argues that this case must be remanded to allow another ALJ to properly weigh Dr. Colby's 2008 RFC and the medical expert's testimony. This Court finds Defendant's argument unpersuasive because the record contains overwhelming proof that Plaintiff is disabled under 42 U.S.C. § 423(d)(1)(A). *See Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992) ("Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate.").

active, she would need to rest in bed for the next day or two.  (*Id.*)  This opinion is

consistent with Plaintiff's reports to Dr. Colby during her frequent visits for

evaluation and treatment for fibromyalgia pain.  (*See, e.g.*, Tr. 476–77, 489.)  It is

also consistent with Plaintiff's reports to Dr. Moutvic at Mayo Clinic, who

evaluated Plaintiff and diagnosed her with fibromyalgia.  (Tr. 435–37.)  And

Dr. Colby's more specific 2008 RFC opinion, limiting Plaintiff's sitting and

standing to thirty minutes at a time, but for less than two hours a day each, was

consistent with his earlier opinion that Plaintiff could not stand, sit, walk, carry or

lift "for any length of time."   (Tr. 467, 661.)  The only discrepancy between

Dr. Colby's 2005 and 2008 opinions is that in 2005 Dr. Colby said Plaintiff could

not "carry or lift for any length of time nor anything over approximately 55#" and

in 2008, Dr. Colby indicated that Plaintiff could occasionally lift less than ten

pounds and never lift more than ten pounds.  (Tr. 467, 662.)  But Plaintiff testified

she thought 55 pounds was a misprint in the 2005 letter, and it appears the

medical expert agreed.  (Tr. 40–41 (stating that the 55 pound notation "didn't

really seem to fit in with the rest of [Dr. Colby's] assessment").)  In light of all

evidence in the record, this Court tends to agree as well,[13] which indicates that

this supposed inconsistency is merely typographical.

---

[13]     Further, Dr. Colby's 2005 letter is less than clear as to what Dr. Colby
meant by stating that Plaintiff could not "carry or lift for any length of time nor
anything over approximately 55#."  He could have meant that she would not be
able to carry or lift *any amount for any length of time.*

As stated above, the ALJ could grant more weight to the nonexamining state agency consultants' less restrictive RFC opinions if their opinions were supported by better or more thorough evidence than Dr. Colby's opinion.  Here, that is not the case.  First, the physical, not the mental, RFC opinions were at issue.  Second, Dr. Suddard's opinion, which the ALJ gave "considerable probative weight" but did not adopt (Tr. 19.), was based on what Dr. Suddard described as a "lack of objective findings to support multiple pain complaints." (Tr. 558.)  Dr. Suddard prescribed aerobic exercise for Plaintiff's condition and stated that "there doesn't seem to be any barrier to seated work," but he qualified this statement by saying that this was "not to suggest that as an RFC."  (Tr. 558.) Further, as discussed above, Plaintiff's diagnosis of fibromyalgia supports her multiple pain complaints, and the record actually does support a "barrier to seated work."  For example, the record reflects that Plaintiff's pain is exacerbated by fatigue, prolonged sitting, repetitive movements, and stress, all of which can occur in seated work.  (Tr. 439, 446, 455, 486, 490.)  And third, although another nonexamining state agency consultant, Dr. Atkin, also offered a less restrictive physical RFC opinion than Dr. Colby, Dr. Atkin's opinion was limited to work restrictions caused by Plaintiff's migraines and chondromalacia patellae of the knees.  (Tr. 630–37.)  Because Dr. Atkin did not consider Plaintiff's fibromyalgia, his opinion does not conflict with Dr. Colby's opinion and cannot outweigh it. Based on the above, a remand is not necessary to weigh the medial opinions.

**B.     Whether Remand is Necessary for the ALJ to Consider Plaintiff's Credibility**

As stated above, the ALJ could have refused to grant controlling weight to Dr. Colby's RFC opinion if it was inconsistent with other substantial evidence in the record as a whole.  The Commissioner contends that the Court should remand so that the ALJ can be given the opportunity to consider evidence of Plaintiff's daily activities that are inconsistent with disability.  The ALJ, however, already had such an opportunity.

The ALJ made a finding that Plaintiff's treatment was generally successful.  But this finding is inconsistent with Plaintiff's subjective complaints that her symptoms recurred often, and she frequently rated her pain as severe.  (Tr. 35, 446, 471, 473, 480, 485, 488, 489, 491, 494.)  The ALJ also noted that Plaintiff failed to pursue the Mayo Clinic Pain Rehabilitation Program and did not exercise as often as prescribed.  (Tr. 16.)  However, Plaintiff's explanations for these facts are found in the record and are supported by substantial evidence.  Plaintiff and her husband lived on a farm.  Although Plaintiff did very little farm work—which the ALJ recognized by making a finding that Plaintiff's farm work did not amount to substantial gainful activity during the relevant time period (Tr. 12.)—she did not attend the three-day program at Mayo Clinic because she and her husband had farm work to do at that time.  (Tr. 491.)  The record does reflect that Plaintiff attended a half-day Fibromyalgia Treatment Program.  (Tr. 451–52.)  And generally, when Plaintiff tried to do too much (usually when doing activities for

the benefit of her children or her livelihood), she found herself in severe pain. (*See, e.g.*, Tr. 476.)  For example, when Plaintiff spent one long day at the Mall of America, she suffered.  And during a physical therapy appointment, after trying some exercises, Plaintiff "reported to be in too much pain to progress further today."  (Tr. 453.)  Plaintiff also reported that she only gave her son a ride on a four wheeler a couple times a year.  Therefore, it seems reasonable that she would have avoided further exercise.  Moreover, the fact that Plaintiff occasionally tried to push herself on days that she felt better so that she could be a part of her family's activities is not inconsistent with disability.  *See Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009) ("[Plaintiff's] ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work.").

Furthermore, this evidence regarding Plaintiff's daily activities is consistent with Dr. Colby's RFC opinion, as Dr. Colby recognized that Plaintiff had good days and bad days.  (Tr. 663.)  And the record reflects that Plaintiff's fibromyalgia flared up when she tried to do too much, and it limited her daily activities such that it required her to have personal-care-attendant services and frequent treatment for fibromyalgia pain.  After careful review, this Court concludes that Dr. Colby's opinion that Plaintiff's fibromyalgia would limit her to sedentary part-time work was consistent with the record as a whole, and should have been granted controlling weight, even in light of Plaintiff's daily activities.

Dr. Frazin, the medical expert at the hearing, agreed with Dr. Colby.  And the vocational expert testified that a person of Plaintiff's age, education, work history, and impairments, who would be unable to attend work with persistence and pace, would be limited to part-time work, and would miss work more than two days per month, could not perform any jobs.  (Tr. 44.)[14]   Therefore, because the record is fully developed and Dr. Colby's opinion is consistent with the record as a whole, and based on the vocational expert's testimony, this Court concludes that reversal and remand for an immediate award of benefits is the appropriate remedy rather than a remand for further proceedings.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **GRANTED**, and the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for reversal and award of benefits;

2.     Defendant's Motion to Remand (Doc. No. 14), be **DENIED**; and

---

[14]     In her decision, the ALJ only considered the vocational expert's response to her *first* hypothetical, which did not include Dr. Colby's statements in his 2008 opinion regarding Plaintiff's limitations (lack of persistence and pace, limited to part-time work, missing more than two days of work per month).  (*See* Tr. 22, 43.)  Her *second* hypothetical included these limitations and is the relevant hypothetical to this case.  (*See* Tr. 44.)

3.      Judgment be entered accordingly.


Date: June 11, 2012                    _s/ Jeffrey J. Keyes_____
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge


Under Local Rule 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**June 25, 2012**, a writing which specifically identifies those portions of this Report
to which objections are made and the bases of those objections.  Failure to
comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  All briefs filed
under this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.